# WARD, Appellant, v. HARTLEY.

### Division One, November 25, 1903.

1. **Invalid Agreement: WHO AFFECTED.** When an agreement has no legal consideration to support it, it can not be made the basis of a cause of action nor of an affirmative defense. And the question of which party is to suffer by it, depends on which party is forced to rely upon it.

2. ———: ———: **PUBLIC POLICY.** Either party coming into court seeking relief touching past transactions growing out of an agreement void because contrary to public policy, will be denied relief. The courts have nothing to do with transactions growing out of such contracts, but will leave the parties just where their own voluntary acts have placed them.

3. ———: **CONSIDERATION.** A contract that the election expenses of a member of a firm for bricklaying and building, who was a candidate for the position of president of the city council, should be paid out of the partnership's funds, on the theory that the firm would thereby receive advertisement, would in any case be of doubtful consideration, and in this case is held to be without legal consideration.

4. ———: **CONTRARY TO PUBLIC POLICY.** When the validity of a contract is challenged on the ground that it is contrary to public policy, it is to be investigated just as the courts investigate a transaction that is charged to have been contrived in fraud. There is no inflexible rule to apply to it, but its validity is to be determined by the circumstances of the case.

5. ———: ———: **ELECTION EXPENSES.** Where partners of a bricklaying and building firm agreed to use the partnership funds to pay the election expenses of a partner who was a candidate for the position of president of a city council, and the evidence shows

that the chief business of the firm related to contracts for the city's public works, the agreement is liable to the imputation that it was against public policy. But if the money was actually used with the knowledge and consent of the other partner, he will not be heard, in the settlement of the partnership affairs, to say that the agreement was void as contrary to public policy. The court will not give him affirmative relief, but will leave him just where the transaction placed him.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher*, Judge.

REVERSED AND REMANDED (*with directions*).

*Carl Otto* for appellant.

(1) Public policy of Missouri in the early spring of 1893 did not forbid the expenditure, in an honorable way, of money at an election for president of the city council of St. Louis. Keating v. Hyde, 23 Mo. App. 561; 15 Am. and Eng. Ency. Law (2 Ed.), 984; State etc., v. Bland, 144 Mo. 534. (2) The test as to whether a demand connected with an illegal transaction be capable of being enforced is, whether the plaintiff must rely on same to establish his case, or if plaintiff can not open his case without introducing same, the courts will not hear him. Tyler v. Larimore, 19 Mo. App. 458; Green v. Corrigan, 87 Mo. 370. (3) In the United States courts (Brooks v. Martin, 69 U. S. 70) the rule, "where the transactions which were illegal have become accomplished facts and can not be affected by any action of the court in the case, it is difficult to see what rule of public morals will be weakened by compelling the holder of the fruits to account for same," has been stated and followed in Ottaway v. Bank, 15 Mo. App. 578. (4) It may be stated, as a general rule, that the courts will not assist the members of an illegal partnership in any way to enforce or carry out their illegal objects, nor can a suit for an accounting of the partnership business be maintained. 22 Am. and Eng.

Ency. of Law, 74.   (5)   Greenhood on Public Policy, 108, says: ''And the facts that a partnership engages in one transaction, which is opposed to public policy, is no objection to a bill to compel each partner to account to the other for the profits of the general business, though the profits of such transaction be included,'' citing Gualloh v. Thrasher, 42 Ga. 429.   (6)   Our position is this: The firm spent its money strictly according to law and public policy, but, whether in accordance with, or against public policy, is immaterial; the fact was recorded as and when it occurred. Nothing resulted either for or against public policy from this expenditure.

*T. J. Rowe* for respondent.

VALLIANT, J.—Plaintiff and defendant entered into co-partnership, in 1890, in the city of St. Louis, to transact the business of building and bricklaying.   The firm continued in business from the date above named until September, 1895, during which period they transacted a  large business, the gross receipts from which amounted to more than $300,000.

There had been no statement or adjustment of their accounts between themselves in September, 1896, when, to enforce such settlement, this suit was begun.   By agreement the cause was referred to a referee who, after due hearing, stated the account and made his report.   After that report was filed it became necessary to refer the case again to the same referee to supplement his report by taking account of payments of debts of the firm which the plaintiff had since paid.   The referee made his second report which was final.   The conclusion of the referee was that if neither party had drawn anything out of the firm treasury there would be in the treasury for division between the two $9,114.11, whereof each would be entitled to $4,557.05, but that defendant had drawn out for his own use $9,765.10, while

the plaintiff had drawn out nothing, and therefore but for one outstanding debt amounting to $671.01, the defendant would be indebted to the plaintiff in the sum of $5,208.04. But the report recited that the plaintiff, for the sake of a final disposal of the case, without further delay, consented that the referee might state the account as if that firm debt had been paid by the defendant, and in pursuance thereof the referee so stated the account and found that there was a balance due from the defendant to the plaintiff of $4,872.54, for which sum the referee recommended that judgment be rendered in favor of the plaintiff and that each party pay half the costs.

It is unnecessary to state the account more in detail, for the reason that there is really but one item in dispute, that is, $7,200 charged in the firm's expense account under the head of ''election expenses.'' The report of the referee on this item is as follows:

''This item is one of the main points of disagreement between the partners. And it seems to have stood in the way of their arriving at any settlement of their accounts among themselves. In the spring of 1893 plaintiff was a candidate for the office of president of the City Council. And he claims that the expenses he incurred in that election amounted to about $9,000, and he charged $7,200 of this amount to the firm. He testifies that it was agreed between him and defendant that his election expenses should be borne by the firm. Several other witnesses testified to the fact that defendant told them that the firm was paying the election expenses of plaintiff. It appears that plaintiff had been a member of the House of Delegates, and he testified that the firm secured its business largely by reason of the fact that he was in politics. He further testified that his election would further the chances of payment of several claims which the firm held. Defendant was present at the hearing before me but was not sworn as a witness. I accordingly find that defendant believed

that the election of plaintiff would be an advantage to the firm in a business point of view, and that defendant did agree that the firm would pay the election expenses of plaintiff and that they might be paid with the funds of the firm. Having agreed that the firm funds should be paid out for this purpose defendant can not now object to that expenditure. Ordinarily, defendant would be entitled to an itemized statement of the expenditures; from the nature of the expenditures it might not be reasonable that all the items of small expenditure should be given in detail, but defendant would be entitled to a statement itemized to a reasonable degree, at least. But it was testified by plaintiff and Mr. O'Reilly that this item of $7,200 was entered in the books of the firm in June, 1893, a few months after the election, and that defendant some times looked over the books. Defendant did not take the stand at all, but remained silent. I conclude, therefore, that this item was entered in the books at the time stated and was seen by defendant. But he does not appear to have made any objection to it until sometime in 1896. And then, as I gather from the testimony, his objection was to the entire item as an unauthorized expenditure. Defendant having agreed that the expenditures should be paid by the firm when he saw the amount entered in the books if he questioned the correctness of the amount, he should then have called for an itemized statement or other proof of the correctness of the sum entered in the book, and not let the charge stand unchallenged for about three years.''

Accompanying the referee's report is a schedule showing the works upon which the firm had been engaged, from which its receipts had been derived. Much the larger part of these were public works in the city.

The defendant filed exceptions to the report of the referee, the chief of which was aimed at this item of election expenses which the referee had allowed. The main ground of the defendant's exception to the item was that the agreement that the firm should pay it

was void because it was without consideration and against public policy. The court sustained the exception and struck out that item, the effect of which was to reduce the amount which plaintiff was entitled to recover to $1,272.54, for which sum judgment for the plaintiff was entered, each party to pay half the costs.

The plaintiff appeals from that judgment and assigns for error the action of the court in striking out that disputed item.

When an agreement has no legal considerations to support it, it can not be made the basis of a cause of action nor of an affirmative defense. If such an agreement is relied upon for the cause of action, the plaintiff can not prevail; if such is relied on by the defendant in a plea of confession and avoidance, the defense will fail. The question, therefore, of who is to suffer, because the agreement is invalid, depends upon which party is forced to rely upon it. And so it is with a contract void because contrary to public policy; whichever party comes into court relying on it will be turned out, and not only will he be turned out when he comes seeking to enforce a contract contrary to public policy, but when he comes, either as plaintiff or defendant, seeking relief touching past transactions growing out of such a contract, the court will not listen to him. The court has no more regard for the man who comes seeking to recover what he voluntarily laid out in furtherance of an unlawful project than it has for one who seeks to enforce an unlawful contract. Courts prefer to have nothing to do with transactions growing out of such contracts, and to leave parties just where their own voluntary acts in such cases have placed them. [Tyler v. Larimore, 19 Mo. App. 458; Attoway v. Bank, 15 Mo. App. 578; Green v. Corrigan, 87 Mo. 359.]

It appears from the record before us that the plaintiff and defendant were partners engaged in the trade of bricklaying and building; they undertook large contracts, the largest of which were for public works; they

were competitors in the market with other concerns for like work; the plaintiff had been a member of the House of Delegates, and was, at the time of incurring the expenses in question, a candidate for the office of president of the Council. Both partners were of the opinion that the firm had derived benefit in the past because of the prominence of the plaintiff in politics, and would derive benefit in the future if he should be elected to the office for which he was a candidate, and for that reason it was agreed between them that the plaintiff should pay the expenses he would incur in his race for the office out of the funds in the partnership treasury; that the plaintiff did so and defendant knew it; that the partnership continued thereafter for more than two years and in the course of the partnership the defendant drew out of the treasury for his own use nearly $10,000, which was a considerable overdraft of his share, and left nothing for the plaintiff. The position of the defendant now is that plaintiff must put back into the treasury the $7,200 of election expenses, paid out as above indicated, before the balance is struck in the co-partnership account, because, he says, there was no consideration to support his agreement to pay those expenses out of partnership funds and, besides, the contract was against public policy.

The consideration to support the agreement was, to say most for it, of doubtful validity. It may be that the mere *eclat* which the parties supposed would reflect on the firm by the elevation of one of its members to the high office in the city government, was all that was contemplated, and it may be that they estimated that distinction as being worth the money they agreed to pay for it, just as many firms indulge in other forms of advertisement. But beyond that we can perceive no consideration for the agreement. The firm as bricklayers and builders could derive no legal advantage from the fact that one of its members was president of the Coun-

cil, and if the plaintiff had been elected and had faithfully performed his duty in the office, as the law presumes he would, the firm would have derived no illegal advantage from his position. Therefore, the motive for the agreement does not sufficiently appear to justify us in holding that it was supported by a legal consideration. The only theory on which direct advantage to the firm could be expected is, that the plaintiff, if he had been elected, would have used his official influence to favor his firm over others in like business. But such a course would be liable to result in detriment to the public service, and would be contrary to public policy. When the validity of a contract is challenged on the ground that it is contrary to public policy, it is to be investigated as we investigate a transaction that is charged to have been contrived in fraud; we have no inflexible rule to apply to it, but must be governed by the circumstances of the case.

In 15 Am. and Eng. Ency. Law (2 Ed.), p. 971, the law-writer says: "It is a general rule that contracts which place the individual interests of the public officers in conflict with their duty to the public, or otherwise place them under an inducement to act in violation of such duty, are illegal." And in the same connection it is said: "In determining the validity of the contract, its actual effect upon the officer is immaterial, and therefore the fact that the contract did not actually have any corrupting influence upon the officer will not relieve it of illegality." [P. 972.] In Koehler v. Feuerbacher, 2 Mo. App. 11, the court, per BAKEWELL, J., said: "Contracts in total restraint of trade, or of marriage, against the prohibitions of statutes, to infringe a copyright, to defraud the government or third parties, to oppress third parties or prevent the due course of justice, or induce a violation of public duty, that tend to encourage unlawful or immoral acts or that are founded on trading with an enemy, are all against public policy, and void. And, probably, this is a complete enumeration

of the several classes to which contracts against public
policy may be reduced."

In Story on Contracts (5 Ed.), section 675, the au-
thor, speaking of public policy, says: "It has never
been defined by the courts, but has been left loose and
free of definition, in the same manner as fraud.  This
rule, however, may be safely laid down, that wherever
any contract conflicts with the morals of the time, and
contravenes any established interest of society, it is
void, as being against public policy."

In view of the fact that the chief building contracts
on which this firm was engaged related to public works,
the agreement between the partners to pay the election
expenses of the plaintiff out of funds in the treasury
of the firm, is liable to the imputation (whether justly
so in fact or not) that it was founded on such an under-
standing between them as was against public policy, and
it is, therefore, one of those contracts which the courts
decline to have anything to do with, either to enforce,
if it remains unexecuted, or to relieve against, if what
was intended to be done has already been done.  If the
plaintiff in this case were now seeking to require his
quondam partner to contribute to the payment of these
election expenses on the ground that he had agreed to
do it, and that the plaintiff had incurred the expenses
on the faith of the agreement, the court would turn the
plaintiff away without relief.

But the plaintiff is not here in that attitude.  These
expenses were not only agreed to be paid, but they were
in fact paid out of the funds in the firm's treasury, with
the knowledge and consent of the defendant, and it is he
who is asking to be relieved against the situation in
which he voluntarily placed himself in doing what he
now says was wrong against the public.  In such case
the court looks as coldly on the defendant as in the
other view it looked on the plaintiff.

There is no suggestion in this record that this
money was spent for an improper purpose.  The law

condemns the use of money to influence voters or election officers, but it recognizes that there are legitimate expenses to be met in a political campaign, therefore, the mere fact that the plaintiff expended money for the purpose disclosed by the evidence does not carry the implication that it was spent for an unlawful purpose. The plaintiff had no more right to use the firm's money to pay his election expenses than he would have had to use it to pay any other individual debt of his own. But partners may agree among themselves to donate any portion of the firm's money to any legitimate object, and if one of the partners, authorized by the others, does so, it is, as between themselves, as legitimate a use of the money as if it had been paid out in the discharge of a firm obligation. When a political campaign is on, if the members of a commercial firm get together and agree to contribute out of the firm treasury a certain sum to be used in the legitimate expenses of a particular candidate or party, and authorize one of their firm to pay the amount out of the firm assets then in his hands, as long as that agreement is unexecuted either party may repent of his agreement and forbid its execution, because it has no consideration to support it, but if the partner who was directed to make the payment actually does so before any other member of the firm withdraws his consent, it becomes as to all the members a voluntary payment and the partner who has made the disbursement can not be called to account for it. That is just such a case as we now have before us for decision. The plaintiff has not this money in his hands. He has, with the knowledge and consent of the defendant, long since paid it out to strangers to this record. The defendant's attitude is that of asking the court to decree that the plaintiff bring that money back. It is the defendant who is asking affirmative relief to lift him out of the consequences of his own self-alleged illegal contract, to throw the whole burden of their joint act on the plaintiff who at the

worst was only *in pari delicto* with the defendant him-
self.    The court will leave them, in respect to that
transaction, just where it found them.

The judgment is reversed and the cause remanded
to the circuit court with directions to overrule the excep-
tions to the referee's report, and enter judgment for the
plaintiff as therein recommended, adding to the $4,-
872.54 interest at the rate of six per cent per annum
from the date of the report, June 26, 1900, to date of
the judgment.

All concur.